# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**IN THE MATTER OF EP ENERGY E&P COMPANY, L.P.,**
*Debtor*

**STOREY MINERALS, LIMITED; STOREY SURFACE, LIMITED; MALTSBERGER, L.L.C.; MALTSBERGER/STOREY RANCH, L.L.C.; MALTSBERGER/STOREY RANCH LANDS, L.L.C.; RENE R. BARRIENTOS, LIMITED,**
*Appellants*

**v.**

**EP ENERGY E&P COMPANY, L.P.,**
*Appellee*

On Appeal from the United States District Court for the Southern District of Texas, Houston Division, Case No. 4:21-CV-04148, Hon. Charles Eskridge

## BRIEF OF APPELLANTS

Patrick L. Hughes
Natasha Belle Breaux
Christina Fontenot Crozier
David A. Trausch
HAYNES AND BOONE, LLP
1221 McKinney, Suite 4000
Houston, Texas 77010
Phone: (713) 547-2000
patrick.hughes@haynesboone.com
natasha.breaux@haynesboone.com
christina.crozier@haynesboone.com
david.trausch@haynesboone.com

Christopher Lance Halgren
Austin W. Brister
MCGINNIS LOCHRIDGE LLP
609 Main Street, Suite 2800
Houston, TX 77002
Phone: (713) 615-8539
chalgren@mcginnislaw.com
abrister@mcginnislaw.com

Shannon H. Ratliff
DAVID GERALD & CREMER
515 Congress Ave., Suite 1510
Austin, Texas 78701
Phone: (512) 493-9600
shratliff@dgclaw.com

Carlos R. Soltero
MAYNARD NEXSEN, PC
2500 Bee Caves Road
Building 1, Suite 150
Austin, Texas 78746
Phone: (737) 202-4873
csoltero@maynardnexsen.com

Lee E. Bains, Jr.
MAYNARD NEXSEN, PC
1901 Sixth Avenue North
Suite 1700
Birmingham, AL 35203
Phone: (205) 254-1022
lbains@maynardnexsen.com

# CERTIFICATE OF INTERESTED PARTIES

Appellants certify that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

## I.     Appellants

Storey Minerals, Ltd.
Storey Surface, Ltd.
Maltsberger, LLC
Maltsberger/Storey Ranch LLC
Maltsberger/Storey Ranch Lands, LLC
Rene R. Barrientos, Ltd.

Appellants have no parent corporation and no publicly held corporation owns 10% or more of their member or partnership interest.

*Counsel:*

Patrick L. Hughes
Natasha Belle Breaux
Christina Fontenot Crozier
David A. Trausch
HAYNES AND BOONE, LLP
1221 McKinney St, Suite 4000
Houston, TX 77375

Christopher Lance Halgren
Austin W. Brister
MCGINNIS LOCHRIDGE LLP
609 Main Street, Suite 2800
Houston, TX 77002

Carlos R. Soltero
MAYNARD NEXSEN, PC
2500 Bee Caves Road
Building 1, Suite 150
Austin, TX 78746

Lee E. Bains, Jr.
MAYNARD NEXSEN, PC
1901 Sixth Avenue North
Suite 1700
Birmingham, AL  35203

Shannon H. Ratliff
DAVIS GERALD & CREMER
515 Congress Avenue, Suite 1510
Austin, TX 78701

## II.     Debtor/Appellee

EP Energy E&P Company, L.L.C. f/k/a EP Energy E&P Company, L.P.

In the district court, Appellee certified that its ultimate parent corporation is Verdun Oil Company, L.L.C. and that no publicly held corporation owns 10% or more of Verdun Oil Company, L.L.C.'s stock.

*Counsel:*

Mark W. Hanna
William G. Cochran
SCOTT DOUGLASS & MCCONNICO LLP
303 Colorado Street, Suite 2400
Austin, TX 78701-3234

Clifford W. Carlson
Hillarie James
WEIL, GOTHSHAL & MANGES, LLP
700 Louisiana Street, Suite 1700
Houston, TX 77002

/s/ Patrick L. Hughes  
Patrick L. Hughes

***Attorney of record for Appellants Storey Minerals, Ltd., Storey Surface, Ltd., Maltsberger, LLC, Maltsberger/Storey Ranch, LLC, Maltsberger/Storey Ranch Lands, LLC, and Rene R. Barrientos, Ltd.***

## STATEMENT REGARDING ORAL ARGUMENT

Appellants Storey Minerals, Ltd., Storey Surface, Ltd., Maltsberger, LLC, Maltsberger/Storey Ranch, LLC, Maltsberger/Storey Ranch Lands, LLC, and Rene R. Barrientos, Ltd. (collectively, the "MSB Owners") respectfully request oral argument.

This case presents novel, important legal questions regarding the bankruptcy court's post-confirmation exercise of jurisdiction over state-law governed tort claims that were entitled to adjudication before a state court. The bankruptcy court impermissibly expanded its Article I jurisdiction to adjudicate state-law claims—a violation of states' rights. Thus, the outcome of this appeal will have important implications on the balance between federal and state jurisdiction. Further, if the Court concludes that jurisdiction exists, it will have to determine complex legal and factual issues concerning 16 nonstandard oil and gas leases based on Texas law.

The MSB Owners respectfully submit that oral argument would help clarify these complex issues and would be particularly beneficial considering the importance and novelty of these issues.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES..........................................................i

STATEMENT REGARDING ORAL ARGUMENT ...........................................iv

TABLE OF CONTENTS ..................................................................................... v

TABLE OF AUTHORITIES ...........................................................................viii

STATEMENT OF JURISDICTION..................................................................... 1

STATEMENT OF THE ISSUES.......................................................................... 1

STATEMENT OF THE CASE...............................................................................2

I.      EPLP and the MSB Owners entered into customized oil and gas
        leases with provisions not found in typical leases............................. 2

II.     EPLP filed for bankruptcy and then voluntarily chose to cease
        all production without conducting workover operations.................... 5

III.    The MSB Owners sought to file State-Law Claims against
        EPLP in state court and preserved their rights through an
        Administrative Expense Reservation in bankruptcy court. ........... 6

IV.     The bankruptcy court exercised jurisdiction over the State-Law
        Claims and denied them as "futile." ...........................................11

SUMMARY OF THE ARGUMENT ................................................................. 12

STANDARD OF REVIEW ................................................................................15

ARGUMENT .....................................................................................................15

I.      Federal courts lack jurisdiction to adjudicate the State-Law
        Claims and Administrative Expense Reservation. ........................15

        A.      There is no subject-matter jurisdiction over the State-Law
                Claims............................................................................... 16

        B.      The Administrative Expense Reservation does not create
                jurisdiction over the State-Law Claims............................. 18

C. The Administrative Expense Reservation was preservative and not ripe. ................................................................ 23

II. The State-Law Claims are not "futile" because the MSB Leases terminated under their express terms.................................................31

A. Texas law enforces oil and gas leases according to their terms, even when those terms diverge from those of typical leases. ........................................................................... 32

B. The Subsequent Operations clause did not maintain the Leases. ................................................................................ 36

1. The "shall terminate unless" language creates a special limitation, not a savings clause................................... 38

2. The Subsequent Operations clause required EPLP to timely commence drilling or reworking operations; merely resuming production was insufficient.................................................................. 41

3. The Subsequent Operations provision does not allow voluntary cessation without required operations. ................................................................. 43

4. The district court misinterpreted the "deemed permanent" language in the Leases.......................................... 47

C. The Continuous Development clause did not maintain the Leases. ................................................................................ 50

1. The Continuous Development clause expressly indicates it is subordinate to other provisions that may cause earlier termination, including the Subsequent Operations clause................................................ 50

2. Different triggering language must be given different meanings. ............................................................... 52

3. The Continuous Development clause is designed to work with both the Production Units clause and

Subsequent Operations clause to promote continuous and complete development of the entire leased premises...................................................54

CONCLUSION.................................................................................57

CERTIFICATE OF SERVICE ........................................................60

ECF CERTIFICATION....................................................................60

CERTIFICATE OF COMPLIANCE................................................ 61

# TABLE OF AUTHORITIES

<strong>Page(s)</strong>

**Cases**

*Anadarko Petroleum Corp. v. Thompson,*
  94 S.W.3d 550 (Tex. 2002) ...................................................................... 40

*In re Bass,*
  171 F.3d 1016 (5th Cir. 1999) ................................................................ 17

*Bd. of Ins. Com'rs of Tex. v. Guardian Life Ins. Co. of Tex.,*
  180 S.W.2d 906 (Tex. 1944) .................................................................. 43

*Blackmon v. XTO Energy, Inc.,*
  276 S.W.3d 600 (Tex. App.—Waco 2008) .......................................... 39

*In re Blackwell,*
  267 B.R. 732 (Bankr. W.D. Tex. 2001) ............................................... 26

*BP Am. Prod. Co. v. Red Deer Res., LLC,*
  526 S.W.3d 389 (Tex. 2017) .................................................................. 32

*Butner v. U.S.,*
  440 U.S. 48 (1979) ................................................................................. 29

*In re Canion,*
  196 F.3d 579 (5th Cir. 1999) ................................................................ 20

*Cantu v Beck Redden,*
  No. 24-40275, 2024 WL 5199328 (5th Cir. Dec. 23, 2024) ............... 31

*CarMax Auto Superstores, Inc. v. JP Morgan Chase Bank, N.A.,*
  No. H-07-2147, 2008 WL 11429834 (S.D. Tex. May 13, 2008) ........ 16

*Celotex Corp. v. Edwards,*
  514 U.S. 300 (1995) ............................................................................... 16

*Cent. & S. W. Servs., Inc. v. E.P.A.,*
  220 F.3d 683 (5th Cir. 2000) ................................................................ 26

*Chandler v. Drummet*,
557 S.W.2d 313 (Tex. Civ. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.) ........................................................................ 38

*In re Charlesbank Laundry, Inc.*,
755 F.2d 200 (1st Cir. 1985) ................................................... 9

*Matter of Chesapeake Energy Corp.*,
70 F.4th 273 (5th Cir 2023) .................................................... 20

*Cmty. Bank of Raymore v. Chesapeake Expl., L.L.C.*,
416 S.W.3d 750 (Tex. App.—El Paso 2013, no pet.) .................... 43, 55, 56

*Cochran v. S.E.C.*,
20 F.4th 194 (5th Cir. 2021) ................................................... 24

*In re Craig's Stores of Tex., Inc.*,
266 F.3d 388 (5th Cir. 2001) ................................................... 17

*Devon Energy Production Co. L.P. v. Sheppard*,
668 S.W.3d 332 (Tex. 2023). .................................................. 34

*Duke v. Sun Oil Co.*,
320 F.2d 853 (5th Cir. 1963), *decision clarified on reh'g*,
323 F.2d 518 (5th Cir. 1963) ................................................... 40

*Endeavor Energy Res. L.P. v. Discovery Operating, Inc.*,
554 S.W.3d 586 (Tex. 2018) .................................................... 35, 41, 45

*Endeavor Energy Res., L.P. v. Energen Res. Corp.*,
615 S.W.3d 144 (Tex. 2020) .................................................... 34, 40

*EP Energy E&P Co. v. Storey Minerals, Ltd.*,
No. 04-19-00534-CV, 2022 WL 223253 (Tex. App.—San Antonio
Jan. 26, 2022, pet. denied) ...................................................... 3, 32

*In re Galaz*,
665 F. App'x 372 (5th Cir. 2016) ............................................. 16

*In re Galaz*,
765 F.3d 426 (5th Cir. 2014) ................................................... 15

*Grynberg v. Grey Wolf Drilling Co. LP*,
296 S.W.3d 132 (Tex. App.—Houston [14th Dist.] 2009, no pet.)...................49

*Haby v. Stanolind Oil & Gas Co.*,
228 F.2d 298 (5th Cir. 1955) ........................................................................45

*Hitzelberger v. Samedan Oil Corp.*,
948 S.W.2d 497 (Tex. App.—Waco 1997, writ denied)...................................38

*Huawei Techs. USA, Inc. v. Fed. Communications Comm'n*,
2 F.4th 421 (5th Cir. 2021)...........................................................................27

*Int'l Sec. Life Ins. Co. v. Arant*,
463 S.W.2d 523 (Tex. Civ. App.—Amarillo 1971, writ ref'd n.r.e.)..................43

*John Corp. v. City of Hous.*,
214 F.3d 573 (5th Cir. 2000) .........................................................................27

*Lower Colo. River Auth. v. Papalote Creek II, L.L.C.*,
858 F.3d 916 (5th Cir. 2017) .........................................................................23

*Mayo Found. for Med. Educ. & Research v. Courson Oil & Gas, Inc.*
505 S.W.3d 68 (Tex. App.—Amarillo 2016, pet. denied) ...........................55, 56

*Mission Prod. Holdings, Inc. v. Tempnology LLC*,
587 U.S. 370 (2019)......................................................................................29

*Monk v. Huston*,
340 F.3d 279 (5th Cir. 2003) ....................................................................24, 26

*In re Moore*,
739 F3d 724 (5th Cir. 2014) ..........................................................................22

*In re Palmaz Sci., Inc.*,
No. 16-50552-CAG, 2018 WL 661409 (Bankr. W.D. Tex.
Jan. 31, 2018)..............................................................................................16

*Pearson v. Holder*,
624 F.3d 682 (5th Cir. 2010) .........................................................................24

*PopCap Games, Inc. v. MumboJumbo, LLC*,
350 S.W.3d 699 (Tex. App.—Dallas 2011, pet. denied)..................................53

*PPC Acquisition Co. LLC v. Del. Basin Res., LLC*,
  619 S.W.3d 338 (Tex. App.—El Paso 2021, no pet.)..........................................38

*Reading Co. v. Brown*,
  391 U.S. 471 (1968) ...........................................................................................9

*In re Roman Cath. Church of Archdiocese of New Orleans*,
  No. 23-30565, 2024 WL 3440466 (5th Cir. July 17, 2024) ...............................9

*Rosetta Res. Operating, LP v. Martin*,
  645 S.W.3d 212 (Tex. 2022) .........................................................................35, 45

*Samano v. Sun Oil Co.*,
  621 S.W.2d 580 (Tex. 1981)..............................................................................45

*In re Seven Seas Petroleum, Inc.*,
  522 F.3d 575 (5th Cir. 2008) ..............................................................15, 17, 31

*Sundown Energy Ltd. P'ship v. HJSA No. 3, Ltd. P'ship*,
  622 S.W.3d 884 (Tex. 2021) .......................................................... 41, 42, 53

*In re Superior Air Parts, Inc.*,
  516 B.R. 85 (Bankr. N.D. Tex. 2014) ...............................................................18

*Texas v. United States*,
  523 U.S. 296 (1998)...........................................................................................24

*Thoreson v. Fox*,
  390 S.W.2d 308 (Tex. Civ. App.—Amarillo 1965),
  *rev'd on other grounds*, 398 S.W.2d 88 (Tex. 1966) ............................................39

*Tier 1 Res. Partners v. Del. Basin Res. LLC*,
  633 S.W.3d 730 (Tex. App.—El Paso 2021, pet. dism'd) ..................................45

*Vega v. Rexene Corp.*,
  59 F.3d 1242, 1995 WL 413074 (5th Cir. June 20, 1995) ..................................28

*In re VistaCare Group, LLC*,
  678 F.3d 218 (3d Cir. 2012) ..............................................................................30

*Wenske v. Ealy*,
  521 S.W.3d 791 (Tex. 2017) ..............................................................................34

*In re WRT Energy Corp.*,
402 B.R. 717 (Bankr. W.D. La. 2007)...................................................... 30

**Statutes**

11 U.S.C. § 501.............................................................................................. 22

11 U.S.C. § 503.................................................................9, 10, 22, 25, 29, 31

11 U.S.C. § 503(b)(1)(A) ............................................................................19, 20

28 U.S.C. § 158(a).......................................................................................... 1

28 U.S.C. § 158(d)(1) ..................................................................................... 1

28 U.S.C. § 959 ............................................................................................... 29

28 U.S.C. § 1334(b).....................................................................................1, 16

29 U.S.C. § 959(b) .......................................................................................... 29

**Rules**

Fed. R. Bankr. P. 3008 .................................................................................. 30

**Other Authorities**

Black's Law Dictionary (12th ed. 2024).................................................... 48

Bruce Kramer, *The Temporary Cessation Doctrine: A Practical Response
to an Ideological Dilemma*, 43 Baylor L. Rev. 519 (1991) ...................... 46

Christopher Kulander, *Down Step by Step - Ratification of Oil and Gas
Leases by Royalty Interests in Texas*, 73 SMU L. Rev. 251 (2020) ........ 33

Laura Burney, *Implications for the Fate of Implied Covenants and Pro-
Lessor Clauses in the Shale Era Oil and Gas Lease*,
48 St. Mary's L. J. 599 (2017) ................................................................. 33

## STATEMENT OF JURISDICTION

The bankruptcy court lacked jurisdiction, requiring vacatur of the lower courts' orders and opinions, for the reasons discussed infra in Part I of the Argument. The bankruptcy court incorrectly invoked bankruptcy jurisdiction under 28 U.S.C. § 1334(b) and entered its order and opinion on October 6, 2021. ROA.5666-713. The MSB Owners appealed to the district court, which affirmed the bankruptcy court's order and opinion on September 30, 2024. ROA.15660-93; *see* 28 U.S.C. § 158(a). The MSB Owners filed a notice of appeal to this Court on October 22, 2024. ROA.15694-701. This Court has appellate jurisdiction to review the lower courts' final orders and opinions under 28 U.S.C. § 158(d)(1).

## STATEMENT OF THE ISSUES

1. The MSB Owners sought leave post-bankruptcy to file State-Law Claims against EPLP in state court and seek damages that continued to accrue after the bankruptcy ended. Solely to preserve their right to relief on those claims, the MSB Owners separately filed a contingent Administrative Expense Reservation in bankruptcy court by the deadline in the court's Bar Order. Did the lower courts lack jurisdiction to adjudicate the merits of the MSB Owners' State-Law Claims and contingent Administrative Expense Reservation?

2.    When the MSB Owners leased minerals to EPLP, the parties agreed to custom provisions that severely restricted the ways in which EPLP could maintain the Leases without production. In 2020, EPLP chose to voluntarily cease production. The lower courts held that the MSB Owners' State-Law Claims against EPLP were futile because Texas cases interpreting typical leases permit such cessations. Did the lower courts err by misconstruing or rewriting the parties' specially agreed nonstandard Lease terms?

## STATEMENT OF THE CASE

**I.    EPLP and the MSB Owners entered into customized oil and gas leases with provisions not found in typical leases.**

The MSB Owners collectively own ranches in La Salle County, Texas, that cover 35,000 acres. ROA.13154-56, 13158-60. In 2009, in the midst of the Eagle Ford Shale boom, several oil companies sought to enter oil and gas mineral leases with the MSB Owners. ROA.13160-61. This resulted in the MSB Owners severally executing 16 separate, nonstandard oil and gas leases (the "Leases") with EP Energy E&P Company, L.P. ("EPLP"). ROA.13154-56, 13158-61. Although the relevant terms in the 16 Leases are substantially the same, each stands alone in covering different areas

of the MSB Owners' respective ranches. ROA.13154-56, 13158-61; *see also* ROA.12183, 12185.[1]

Each Lease is nearly 70 pages in length and contains customized provisions that are not found in typical lessee-protective mineral leases. ROA.13160-62; *see* ROA.12536-602. Because the MSB Owners' ranches are located in the most favorable "oil rich" portion of the Eagle Ford Shale play, EPLP agreed to hotly-negotiated, lessor-protective provisions that specially protect the MSB Owners' rights. ROA.13160-62; *see also EP Energy E&P Co. v. Storey Minerals, Ltd.*, No. 04-19-00534-CV, 2022 WL 223253, *6 (Tex. App.—San Antonio Jan. 26, 2022, pet. denied). Among other features, the Leases required EPLP to develop minerals on a faster-than-normal schedule with consequences if it failed to meet the strict requirements. *See infra* Argument Part II.

The primary term of each Lease ended on September 30, 2013. ROA.12536, 12541. After the primary term, each Lease ***automatically terminated unless*** "oil or gas is produced from the leased premises or [the] lease is maintained in force and effect under the other terms and provisions" of the Lease. ROA.12541.

---

[1] EPLP has stipulated that "[t]he parties agree that the Leases are identical for purposes of this appeal." ROA.15058.

Several structural aspects of the Leases provide necessary context for the disputed termination provisions. Paragraph III, titled "Primary Term," defined the duration of the Leases:

> Subject to the other provisions and limitations hereof, this lease shall be for a term of four (4) years from the effective date (hereinafter called "primary term"), and as long thereafter as oil or gas is produced from the leased premises or this lease is maintained in force and effect under the other terms and provisions hereof.

ROA.12541. This provision is commonly called a "habendum clause" in Texas oil and gas law. The primary term expired in 2013. ROA.12536, 12541, 15675. After 2013, the Leases remained in force only for as long as EPLP continued to produce oil or gas, or for as long as the Leases excused EPLP from that obligation, all "[s]ubject to the other provisions and limitations" in the Leases. ROA.12541.

After the end of the primary term, EPLP was required to designate "Production Units," which become foundational in operating the Leases from the end of the primary term forward. ROA.12566-68. Each well drilled by EPLP must be assigned to a production unit. ROA.12567-68. EPLP was required to designate production units within 60 days of the end of the primary term for each well existing at that time. ROA.12566-67. EPLP could continue drilling new wells on undeveloped acreage and establishing new production units under the Continuous Development clause. ROA.12565-66.

Once production units are established, the Subsequent Operations clause provides that each established production unit must be maintained—if at all—based on the production or operations in that specific unit. ROA.12569-70. A production unit cannot be maintained by production or operations outside the unit. ROA.12569-70. EPLP designated its production units in 2013 when the primary terms expired and has continued to designate units on the lands where it continued to operate. ROA.1371-2388.

## II. EPLP filed for bankruptcy and then voluntarily chose to cease all production without conducting workover operations.

In October 2019, EPLP and several affiliates (the "Debtors")[2] filed Chapter 11 bankruptcy cases. ROA.11973-96. In March 2020, the Debtors confirmed a reorganization plan, which was vacated when the closing requirements could not be satisfied. ROA.10014, 10225-26.

On April 16, 2020, EPLP transmitted a form letter stating that it was ceasing production on the ground that the COVID-19 pandemic comprised a *force majeure* event. ROA.940. The MSB Owners quickly objected stating, "MSB does not agree

---

[2] The Debtors include EP Energy Corporation, EPE Acquisition, LLC, EP Energy LLC, Everest Acquisition Finance Inc., EP Energy Global LLC, EP Energy Management, L.L.C., EP Energy Resale Company, L.L.C., and EP Energy E&P Company, L.P.

that the force majeure provisions apply and does not consent or acquiesce to the positions taken by EP Energy." ROA.942-43.[3] Nonetheless, EPLP voluntarily ceased all production from the Leases, unilaterally choosing to do so for self-determined economic reasons. ROA.1209-10, 12379, 13129. Thereafter, EPLP unilaterally chose to "turn on" production again, but this restoration of production was not the result of conducting workover or drilling activities as defined in the Leases. ROA.15682.

In August 2020, the Debtors filed and quickly confirmed a fifth amended reorganization plan (the "Plan"), and the bankruptcy court entered an order confirming that Plan (the "Confirmation Order"). ROA.3971-4098. The Effective Date of the Plan was October 1, 2020. ROA.4291-94.

**III.  The MSB Owners sought to file State-Law Claims against EPLP in state court and preserved their rights through an Administrative Expense Reservation in bankruptcy court.**

After the Effective Date, the MSB Owners wanted to file a lawsuit in state court against EPLP and its affiliates to obtain a declaration that the Leases terminated as a result of production cessation and to obtain damages for torts such

---

[3] It was not until months later that EPLP dropped its *force majeure* argument in later proceedings in the bankruptcy court and raised the temporary cessation argument to excuse termination of the Leases, which was the basis of the bankruptcy court's order and is the subject of this appeal. ROA.2667-68.

as trespass and conversion for EPLP's activities on the MSB Owners' land after the Leases terminated. Importantly, language in the Plan and Confirmation Order allowed the MSB Owners to retain their rights and remedies regarding the "MSB Contracts," which meant the Leases, stating in relevant part:

> **5.2** ***Treatment of MSB Claims, Interests, and Controversies.***
>
> (a) EPLP and certain of the MSB Owners are parties to the MSB Contracts. EPLP and the MSB Owners contend that each has, among other things, rights, remedies, entitlements, and defenses pursuant to applicable law, including bankruptcy law, and the MSB Contracts.
> ***
> (f) <u>Prepetition Rights</u>. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the MSB Owners shall retain any real property interests and equitable remedies under the MSB Contracts that do not constitute Claims . . . .
>
> (g) <u>Post-Effective Date Rights</u>. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the MSB Contracts are not amended, limited or otherwise changed, and shall remain fully enforceable from and after the Effective Date, and nothing in the Plan or Confirmation Order modifies, alters or otherwise affects the Debtors' or Reorganized Debtors', as applicable, or the MSB Owners' post-Effective Date rights, duties or obligations under the MSB Contracts.
>
> (h) <u>Confirmation Order</u>. This section 5.2 language shall be included in the Confirmation Order.

ROA.4057-58; *see also* ROA.3993, 4020, 4042.

But the Plan and Confirmation Order contained two other provisions that put the MSB Owners between a rock and hard place: (1) a gatekeeping order, and (2) an administrative expense bar order.

First, in the Plan and Confirmation Order, the bankruptcy court claimed *exclusive* jurisdiction to make a "threshold determination" whether any dispute might constitute the defined term "Claim" (which were enjoined), no matter when it arose or even if it continued well past the Effective Date (the "Gatekeeping Order"). ROA.4058, 4020, 4005-06, 4081. Specifically, the Gatekeeping Order, which is contained in the second portion of Section 5.2(f) of the Plan, states:

> (f) . . . provided, that the Bankruptcy Court retains exclusive jurisdiction to determine whether any dispute with respect to the foregoing comprises a Claim, which threshold determination may be heard upon motion of the MSB Owners or the Debtors or Reorganized Debtors, as applicable.

ROA.4058, 4020. Although the MSB Owners did not believe that their causes of action against EPLP and its affiliates constituted a "Claim" or required a threshold determination or permission to be filed, the MSB Owners were mindful of the Gatekeeping Order and did not want to risk being in contempt of court. ROA.103, 1149, 11650, 11878.

So out of an abundance of caution, the MSB Owners filed a Threshold Motion with an attached proposed state court petition, requesting permission to file a lawsuit

in state court. ROA.11648-66. The proposed suit sought a determination that the Leases terminated and title reverted to the MSB Owners, damages for tortious acts by EPLP and its affiliates after title reverted, and an accounting for property taken and sold or used, among other state-law-based causes of action (the "State-Law Claims"). ROA.5480-99, 11648-66.

Second, the Plan provided that any claim that can give rise to any entitlement to an administrative expense was forever barred and deemed adjudicated absent filing a motion within thirty days of the Effective Date (the "Bar Order"). ROA.4033, 4019, 4057. Requests for payment of an administrative expense are governed by Section 503 of the Bankruptcy Code. ROA.4033; 11 U.S.C. § 503. An administrative expense can include damages arising from state-law claims, when the damages accrued before the Plan's Effective Date. ROA.4033.[4]

Here, the damages the MSB Owners would seek for the State-Law Claims accrued both before and after the Effective Date, comprising damages accruing daily for as long after bankruptcy as EPLP and its affiliates operated under the Leases after they had terminated. ROA.5487-98, 11658-66. The MSB Owners were concerned

---

[4] *See also In re Roman Cath. Church of Archdiocese of New Orleans*, No. 23-30565, 2024 WL 3440466, at *6 & n.4 (5th Cir. July 17, 2024) (citing *Reading Co. v. Brown*, 391 U.S. 471, 482 (1968) and *In re Charlesbank Laundry, Inc.*, 755 F.2d 200, 201, 203 (1st Cir. 1985)).

that the Bar Order would summarily bar any cause of action absent a preservative filing—even beyond a future entitlement to seek administrative expense status if a state court were to award them damages for their State-Law Claims attributable to the period before the Effective Date.

Thus, constrained by the Bar Order, the MSB Owners filed a Motion for Administrative Claim (the "Administrative Claim Motion") that included a reservation of their right under Section 503 to collect any pre-Effective Date damages for the State-Law Claims (sought to be pursued in the separate Threshold Motion) *if* the state court were to award such damages in the future. ROA.136-57. The Administrative Claim Motion also included several different types of claims arising during the bankruptcy unrelated to the dispute in this appeal.[5] The term "Administrative Expense Reservation" in this brief refers solely to the preservation of rights the MSB Owners made as part of the Administrative Expense Motion to

---

[5] The MSB Owners asserted a right to five other types of administrative expenses in the Administrative Expense Motion. ROA.145-51, 5668. These other administrative expense claims are *not* the subject of this appeal and comprised actual claims relating to issues solely arising during the bankruptcy case, such as damages for environmental spills and the taking of surface lands beyond what the Leases allowed. ROA.145-51, 5668. These other claims have all been resolved in separate proceedings.

optionally collect pre-Effective Date damages should any be awarded in the suit requested to be filed in the separate Threshold Motion. ROA.140, 151-55.

## IV. The bankruptcy court exercised jurisdiction over the State-Law Claims and denied them as "futile."

The bankruptcy court never ruled on the MSB Owners' Threshold Motion that sought permission to file the State-Law Claims in state court.[6] That motion was left in limbo. Instead, the bankruptcy court asserted its own jurisdiction over not only the Administrative Expense Reservation in the Administrative Expense Motion but also the entirety of the State-Law Claims, entering an order and memorandum opinion denying not just administrative expense status but also the State-Law Claims on the merits. ROA.5666-713. The bankruptcy court concluded the State-Law Claims were "futile" because the Leases did not terminate and, therefore, "denied" the State-Law Claims. ROA.5667, 5695, 5712-13.

---

[6] Because the bankruptcy court never addressed the Threshold Motion and because the expiration of the statute of limitations period was potentially approaching on the trespass claims arising almost two years earlier, the MSB Owners separately filed a preservative petition asserting the State-Law Claims in state court in May 2022. EPLP removed that case to the bankruptcy court. These circumstances are the subject of a different appeal still pending before the district court. *Maltsberger/Storey Ranch, LLC v. EP Energy Corporation*, No. 4:22-cv-2112. The district court has stayed that appeal until this Court resolves this appeal. *Id.* at Doc. 22.

The MSB Owners appealed to the district court, contending the bankruptcy court erred regarding jurisdiction and the merits. ROA.5714-18, 14555-629. In an opinion and order, the district court affirmed the bankruptcy court. ROA.15660-93. The MSB Owners now appeal to this Court. ROA.15694-701.

## SUMMARY OF THE ARGUMENT

The lower courts erroneously found bankruptcy jurisdiction, usurping states' rights to decide state-law claims. The lower courts should not have adjudicated the MSB Owners' State-Law Claims on the merits because they lacked jurisdiction to do so. The determination of Lease termination and tort claims, most of which accrued well past the bankruptcy Effective Date, belonged in state court.

There is no bankruptcy jurisdiction over the State-Law Claims themselves, and neither lower court held otherwise.

Instead, the lower courts held that bankruptcy jurisdiction over the preservation of rights in the Administrative Expense Reservation was the basis for exercising exclusive bankruptcy jurisdiction over the State-Law Claims too. In so holding, the lower courts completely ignored the Threshold Motion requesting to file a lawsuit asserting the State-Law Claims and the plain language in the Confirmation Order and Plan protecting the MSB Owners' right to pursue relief for the State-Law Claims once the bankruptcy case concluded. That was an

impermissible overreach that is unsupported by the law, and it forced these State-Law Claims into the bankruptcy forum. Moreover, instead of allowing the State-Law Claims to be addressed in an actual lawsuit, the bankruptcy court addressed the matters in a truncated, haphazard motion context that lacked procedural guardrails. A preservation of rights to a possible future administrative expense claim should not serve as a hook that confers bankruptcy jurisdiction over the merits of the MSB Owners' State-Law Claims. Otherwise—through the use of Gatekeeping and Bar Orders—the bankruptcy court can expand its otherwise limited federal jurisdiction beyond its constitutional bounds.

Further, the lower courts should not have adjudicated the merits of the State-Law Claims as part of a decision on the Administrative Expense Reservation, because the Administrative Expense Reservation itself was not ripe for adjudication. The Administrative Expense Reservation—which the MSB Owners filed for preservation only due to the Bar Order and which awaited adjudication of the merits of the State-Law Claims in state court—rested on numerous contingent events that have not occurred here. This deprived the MSB Owners of proper process.

For these reasons, the Court should vacate the orders below for lack of jurisdiction and order that the MSB Owners may adjudicate their State-Law Claims

in state court. This result is necessary to restore proper respect for states' rights to decide claims that are based on their own laws.

Not only did the lower courts err on jurisdiction, but they also erred on the merits. The State-Law Claims are not "futile" and therefore should not have been "denied." The Leases did not permit EPLP to voluntarily cease and resume production for purely economic reasons. The lower courts reached a contrary conclusion by misconstruing the unique, lessor-protective provisions of the Leases to make them consistent with cases applying terms found in typical oil and gas leases. But Texas law enforces oil and gas leases according to their terms, even when those terms diverge from typical leases.

Properly construed, the custom provisions of the Leases explicitly caused the Leases to terminate when EPLP voluntarily ceased production and then elected not to conduct any drilling or reworking. Under the Subsequent Operations clause, the phrase "shall terminate . . . unless" creates a special limitation that actively terminates the Leases, and can only be avoided through drilling or reworking operations—not a savings clause that the lessee can optionally rely upon until it elects to resume production. Nor did the Continuous Development clause keep the Leases in force. That clause is expressly subordinate to other provisions that may cause earlier termination, yet the district court's strained interpretation forced both

clauses into identical interpretations despite their use of materially different triggering language. On top of all that, the district court erred by misapplying the Temporary Cessation of Production Doctrine, misinterpreting the phrase "deemed . . . permanent" in the Subsequent Operations paragraph, and creating internal conflicts within the Leases that render key provisions meaningless.

Therefore, in the event there is jurisdiction, the Court should hold that the Leases terminated and allow matters on the State-Law Claims to proceed.

## STANDARD OF REVIEW

The Court reviews de novo whether the bankruptcy court lacked jurisdiction. *In re Galaz*, 765 F.3d 426, 430 (5th Cir. 2014). If there is jurisdiction, the Court reviews conclusions of law de novo and findings of fact (if any) for clear error. *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 583 (5th Cir. 2008).

## ARGUMENT

**I. Federal courts lack jurisdiction to adjudicate the State-Law Claims and Administrative Expense Reservation.**

Federal courts lack jurisdiction because (1) there is no subject-matter jurisdiction over the State-Law Claims, (2) the Administrative Expense Reservation does not create jurisdiction over the State-Law Claims, and (3) the Administrative Expense Reservation is not ripe. Each reason is addressed in turn.

**A.    There is no subject-matter jurisdiction over the State-Law Claims.**

The lower courts erred by concluding there is subject-matter jurisdiction—namely bankruptcy jurisdiction—over the State-Law Claims. Bankruptcy jurisdiction is limited to proceedings "arising under" the Bankruptcy Code, proceedings "arising in" cases under the Bankruptcy Code, or proceedings "related to" cases under the Bankruptcy Code. 28 U.S.C. § 1334(b); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995).

Proceedings "arise under" the Bankruptcy Code when they "involve a cause of action created or determined by a statutory provision of Title 11." *In re Galaz*, 665 F. App'x 372, 375 (5th Cir. 2016). "Arising in" proceedings refer to "'administrative' matters that arise *only* in bankruptcy cases." *Id.* "In other words, 'arising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Id.* For example, there was no "arising under" nor "arising in" bankruptcy jurisdiction over breach of contract, negligence, fraud, and bad faith claims because those claims could have been asserted even if there was no bankruptcy. *CarMax Auto Superstores, Inc. v. JP Morgan Chase Bank, N.A.*, No. H-07-2147, 2008 WL 11429834, at *4 (S.D. Tex. May 13, 2008); *In re Palmaz Sci., Inc.*, No. 16-50552-CAG, 2018 WL 661409, at *6 (Bankr. W.D. Tex. Jan. 31, 2018).

None of the MSB Owners' State-Law Claims have anything to do with the Bankruptcy Code. ROA.5487-98, 11658-66. These claims exist outside of bankruptcy, stem from the parties' Leases, and are based on state law. ROA.5487-98, 11658-66. Moreover, the tortious conduct has continued well after the Effective Date, through today and beyond. ROA.5487-98, 11658-66. Accordingly, there is no "arising under" nor "arising in" jurisdiction over the State-Law Claims.[7]

Nor is there "related to" bankruptcy jurisdiction over the State-Law Claims. "'Related to' is a term of art in bankruptcy jurisdiction, where its meaning is not as broad as it is in ordinary parlance . . . ." *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999). Its meaning differs depending on whether jurisdiction is invoked before or after confirmation of the bankruptcy plan. *See Seven Seas Petroleum*, 522 F.3d at 580-81, 589. "After a plan is confirmed, the bankruptcy court's jurisdiction is limited to matters pertaining to the implementation or execution of the plan." *Id.* at 589. "This jurisdiction extends to matters that 'impact compliance with or completion of the reorganization plan.'" *Id.* (citation omitted). Post-confirmation jurisdiction is "significantly less than it is in the pre-confirmation context" because the debtor's estate "ceases to exist" upon confirmation. *In re Craig's Stores of Tex., Inc.*, 266 F.3d

---

[7] Nor is there diversity jurisdiction because Texas citizens are on each side. ROA.5484-86.

388, 390 (5th Cir. 2001); *In re Superior Air Parts, Inc.*, 516 B.R. 85, 95 (Bankr. N.D. Tex. 2014).

Here, the post-confirmation standard controls. The bankruptcy court confirmed the Plan on August 27, 2020. ROA.3971, 3993, 4021. The Effective Date was October 1, 2020. ROA.11609. The Threshold Motion attaching the proposed petition asserting the State-Law Claims was filed *after* confirmation and the Effective Date. ROA.11648-66; *see also* ROA.5480.

The post-confirmation standard is not met because the State-Law Claims had nothing to do with the implementation, execution, compliance, or completion of the Plan. The Leases' termination and EPLP's wrongful tortious conduct were and remain entirely unrelated to the bankruptcy. ROA.5487-98, 11658-66. Indeed, the overwhelming majority of the damages sought in the State-Law Claims accrued post-confirmation and continue accruing today. *E.g.*, ROA.5493, 5497.

Neither the bankruptcy court nor the district court confronted whether there is bankruptcy jurisdiction over the State-Law Claims themselves. There is not for the reasons discussed above.

**B.    The Administrative Expense Reservation does not create jurisdiction over the State-Law Claims.**

Instead of confronting jurisdiction over the State-Law Claims themselves as required, the lower courts concluded the bankruptcy court had jurisdiction to

dismiss *the State-Law Claims* because they had jurisdiction to decide *the Administrative Expense Reservation in the Administrative Expense Motion*. ROA.5666, 5674-89, 15663-70. That was an erroneous expansion of federal jurisdiction that usurps states' rights, and simply ignored the terms in the Conformation Order and Plan that protected the MSB Owners' rights regarding protection of their property interests. *Supra* p.7. A preservation of rights to avoid complete bar to any claim as requested to be pursued in the Threshold Motion and to later optionally pursue a potential administrative expense claim—filed to meet a deadline in a Bar Order—does not serve as a hook that creates expanded bankruptcy jurisdiction over state-law claims for which there is no bankruptcy jurisdiction. In holding otherwise, the lower courts erred in numerous ways.

*First*, the lower courts erroneously conflated the State-Law Claims and the Administrative Expense Reservation. The State-Law Claims, which the MSB Owners sought to assert through the Threshold Motion, exist independently of— and materially differ from—the Administrative Expense Reservation in the Administrative Expense Motion. But the breadth of the Bar Order would have extinguished this pursuit, as worded. The Administrative Expense Reservation was filed as a placeholder first to avoid a "gotcha" loss of the State-Law Claims and second to preserve possible future entitlement under Section 503(b)(1)(A) of the

Bankruptcy Code, which has its own set of requirements. ROA.137, 140; *see* 11 U.S.C. § 503(b)(1)(A). It is undisputed that any administrative expense claim could pertain only to damages attributable before the Effective Date—which comprise a very small percentage of the MSB Owners' total potential damages sought in the State-Law Claims—and not thereafter once the Debtors exited bankruptcy. ROA.4033, 11806. In contrast, the State-Law Claims comprise various causes of action that arise solely under Texas law, and the relief sought was much broader than that included in the reservation: determination of title to land, resulting damages, accounting, and specific performance, all extending beyond the Effective Date. ROA.5493-98, 11662-66. Even if there are common facts among the Administrative Expense Reservation and the State-Court Claims, they were not a basis for federalizing the State-Court Claims. *See In re Canion*, 196 F.3d 579, 585 (5th Cir. 1999) ("[The appellant] admits that this proceeding shares common facts with core proceedings in [the] bankruptcy, but correctly points out that common facts alone are insufficient to confer 'related to' jurisdiction.").

*Second*, the district court relied on authority that administrative expense claims fall under "arising under" bankruptcy jurisdiction. ROA.15669 (citing *Matter of Chesapeake Energy Corp.*, 70 F.4th 273, 281 (5th Cir 2023)). But that is beside the point and does not mean there is "arising under" bankruptcy jurisdiction over the

State-Law Claims (which arise under state law and not bankruptcy law). The Threshold Motion seeking to assert to the State-Law Claims was ignored and never ruled upon.

*Third*, the district court reasoned that the purported "arising under" bankruptcy jurisdiction over the Administrative Expense Reservation in the Administrative Expense Motion extended to the State-Law Claims because "the trespass claims 'would necessarily be resolved' in the [administrative expense] allowance process" and "the Bankruptcy Court had to resolve the substantive question of trespass" to determine the Administrative Expense Reservation. ROA.15670. Respectfully, that is faulty, circular reasoning. It is undisputed that the State-Law Claims (e.g., whether EPLP trespassed and any resultant damages) had to be adjudicated before determining the Administrative Expense Reservation (e.g., whether the pre-Effective Date portion of those trespass damages are collectable as an administrative expense under the requirements of Section 503(b)). But that still leaves open the key question: ***Who*** is to determine the State-Law Claims—the state court or the bankruptcy court? The bankruptcy court did not acquire jurisdiction to determine the State-Law Claims simply because they had to be decided before determining the Administrative Expense Reservation, especially when a state court could have determined the State-Law Claims first. In other words, although the

State-Law Claims had to "necessarily be resolved," nothing dictates that they necessarily had to be resolved by the bankruptcy court.

*Fourth*, the district court asserted that "the Fifth Circuit is clear that a bankruptcy court can reach underlying merits of state-law claims when determining the allowance or disallowance of claims against the estate," citing *In re Moore*, 739 F3d 724, 728 (5th Cir. 2014). ROA.15669-70. That misapprehends not only the nature of the Administrative Expense Reservation, but also Fifth Circuit precedent. *Moore* involved a different context: a creditor filing a proof of claim under Section 501 of the Bankruptcy Code. 739 F.3d at 726, 728; *see* 11 U.S.C. § 501. *Moore* has no bearing on the circumstances here: a tort victim seeking to collect any damages that it might be awarded in the future as an administrative expense under Section 503. Neither the bankruptcy court, district court, nor EPLP cited a case where this Court has held that a bankruptcy court may determine the underlying merits of state-law claims when determining ***an administrative expense claim.*** Moreover, here there is an Administrative Expense Reservation filed only for preservation purposes to meet the Bar Order—not an actual claim.

*Fifth*, the district court faulted the MSB Owners for not pointing to authority that holds there is ***not*** bankruptcy jurisdiction over state-law claims in these circumstances. The opposite is also true: EPLP has not pointed to authority that

holds there *is* bankruptcy jurisdiction over state-law claims in these circumstances. The novelty of an issue is not a basis for finding jurisdiction. The MSB Owners' State-Law Claims should be allowed their day in state court.

In summary, any bankruptcy jurisdiction that the bankruptcy court might have had over the narrow reservation made in the Administrative Expense Motion did not warrant the exercise of sweeping bankruptcy jurisdiction over the entirety of the State-Law Claims. The lower courts' holdings otherwise are a novel expansion of bankruptcy jurisdiction that reaches too far; in effect this bypasses the limitations on a bankruptcy court that has already concluded the bankruptcy with a reorganized debtor by forcing parties to litigate their state-law rights in a bankruptcy court and expands the jurisdiction beyond even that of an Article III court. While perhaps expedient, this is constitutionally infirm.

### C. The Administrative Expense Reservation was preservative and not ripe.

Further, the bankruptcy court should not have adjudicated the merits of the State-Law Claims as part of the Administrative Expense Reservation because the Administrative Expense Reservation itself has never been ripe for adjudication.

For "jurisdictional purposes, the litigation 'must be ripe for decision, meaning that it must not be premature or speculative.'" *Lower Colo. River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 922 (5th Cir. 2017) (citation omitted). "The key

[ripeness] considerations are 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003) (citation omitted).

Regarding fitness for a judicial decision: "[I]ssues have been deemed ripe when they would not benefit from any further factual development ***and*** when the court would be in no better position to adjudicate the issues in the future than it is now." *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010) (emphasis added). Although, "[g]enerally, issues are fit for judicial decision if 'any remaining questions are purely legal ones,'" that is not dispositive. *Cochran v. S.E.C.*, 20 F.4th 194, 212-13 (5th Cir. 2021). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up).

Here, the MSB Owners' Administrative Expense Reservation merely preserved a potential administrative expense claim for future possible consideration after the litigation sought in the Threshold Motion was pursued in state court. ROA.140, 151-55. The Administrative Expense Reservation rested on a number of contingent future events that have not happened. The MSB Owners repeatedly explained below that the need for adjudication of the Administrative Expense Reservation would arise only if: (1) the MSB Owners prevail in state court on their

State-Law Claims, (2) the state court awards damages for those State-Law Claims, (3) a portion of those damages are found to be allocable to the pre-Effective Date period, and (4) the MSB Owners optionally choose to pursue administrative expense status for the pre-Effective Date damages. ROA.140, 151-55.

The courts would have been in a better position to adjudicate the Administrative Expense Reservation *after* each of the aforesaid contingencies occurred—if at all. If no pre-Effective Date damages wound up being awarded, then there would have been no administrative expense to allow or disallow. And if pre-Effective Date damages did wind up being awarded, then the MSB Owners would not have been *required* to return to the bankruptcy court for such recovery; they could have simply chosen to forego administrative expense status for any pre-Effective Date damages (which would have been particularly likely if the MSB Owners had been awarded and able to collect substantial post-Effective Date damages). EPLP's argument that those damages do not qualify as administrative expenses under Section 503 does not by itself confer jurisdiction. By the time these matters arose, EPLP had exited bankruptcy, shorn of $4 billion of old liabilities including the $40 million owed to the MSB Owners due to a prior breach of the Leases when EPLP failed to honor a different provision not at issue in this appeal. ROA.1083, 1086, 2900. Leaving the resolution of the State-Law Claims to the state

forum when they largely centered on the post-bankruptcy conduct of the reorganized Debtors was the proper course here.

For these reasons, the Administrative Expense Reservation was not and is not fit for judicial decision. *See Monk*, 340 F.3d at 282 n.2, 283 (holding the dispute was not ripe because "the TCEQ permitting process has not yet run its course" and "[t]he application may or may not be granted"); *In re Blackwell*, 267 B.R. 732, 739-41 (Bankr. W.D. Tex. 2001) (dismissing a bankruptcy proceeding for lack of ripeness because it was unknown whether the party would obtain a judgment in a separate court, which was a precursor to the relief requested in the bankruptcy proceeding).

Even if a claim is fit for decision, it is still unripe if no hardship would result from deferring consideration of the issue. *Cent. & S. W. Servs., Inc. v. E.P.A.*, 220 F.3d 683, 690 (5th Cir. 2000). The Fifth Circuit has emphasized that "even where an issue presents purely legal questions," hardship must be shown to establish ripeness. *Id.* The district court ignored this precedent and did not address hardship at all.

Neither EPLP nor the MSB Owners would suffer hardship by deferring determination of the Administrative Expense Reservation in the Administrative Expense Motion until after adjudication of the State-Law Claims in state court. Deferral would allow EPLP and its affiliates to litigate in the county where they

operate the Leases, retaining any money from mineral production in the meantime. And deferral would benefit the MSB Owners by restoring their rights to have their State-Law Claims heard by a court where the land at issue is located. For this additional and independent reason, the Administrative Expense Reservation was and remains unripe.

The district court based its holding otherwise on the fact that the MSB Owners were the ones who filed the Administrative Expense Motion. ROA.15664-65. But the district court's reliance on that fact overlooked two important things.

First, the Administrative Expense Motion encompassed six different types of administrative expense claims. ROA.145-51, 5668. The Court must "assess ripeness claim by claim." *Huawei Techs. USA, Inc. v. Fed. Communications Comm'n*, 2 F.4th 421, 434 n.27 (5th Cir. 2021) (citing *John Corp. v. City of Hous.*, 214 F.3d 573, 585-86 (5th Cir. 2000)). While some of the administrative expense claims not at issue in this appeal were immediately ripe for a Section 503 decision, that does not mean that the only administrative expense claim at issue here (the Administrative Expense Reservation, which pertained to the State-Law Claims) was also ripe. That awaited the outcome of the requested suit to be filed under the Threshold Motion.

Second, the MSB Owners included the Administrative Expense Reservation in the Administrative Expense Motion only to ensure their preservation, given the

breadth and scope of the Bar Order. ROA.139-40, 151. In the Administrative Expense Motion and at a hearing before the bankruptcy court, the MSB Owners repeatedly emphasized that the Administrative Expense Reservation was "asserted for preservation" and only "if needed" should damages be awarded in separate, future litigation. ROA.140, 151-53, 155, 1145. As just one example among many, the MSB Owners stated the following:

> [T]his [Administrative Expense] Motion seeks to assert and thereby *preserve* any administrative claim status ***should there be damages*** emanating during the cases from that ***separate litigation to come***.

ROA.140 (emphases added).

If the MSB Owners had not preserved the right to any claim at all under the Threshold Motion or to later pursue this administrative expense claim by the Bar Date, then the MSB Owners could have lost their right to pursue relief for the State-Law Claims. *See Vega v. Rexene Corp.*, 59 F.3d 1242, 1995 WL 413074, at *1-3 (5th Cir. June 20, 1995) (explaining that because damages under a separately-filed tort claim were an administrative expense, an administrative expense claim had to be filed before the bar date to "preserve[]" the claim and dismissing the tort claim for failure to do so). In other words, had the MSB Owners not filed the Administrative Expense Reservation, the Debtors could have sought a summary dismissal of the State-Law Claims on the ground that the MSB Owners missed the deadline imposed

by the Bar Order—in effect transforming an administrative expense bar date function into a breathtakingly broad jurisdictional mandate to induce presentation of state-law claims into an Article I court of sharply limited jurisdiction once a debtor exits bankruptcy.

"Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. U.S.,* 440 U.S. 48, 55 (1979); *see also*, *Mission Prod. Holdings, Inc. v. Tempnology LLC*, 587 U.S. 370, 386-87 (2019) ("Section 365 does not grant the debtor an exemption from all of the burdens that generally applicable law— whether involving contracts or trademarks—imposes on property owners. See 29 U.S.C. § 959(b) (requiring a trustee to manage the estate in accordance with applicable law)."). The Debtors during the bankruptcy were obligated to comply with the Leases and to follow the law during the bankruptcy case, and are held accountable for violations or breaches. 28 U.S.C. § 959. This, coupled with the Debtors having exited bankruptcy as well as the ongoing nature of the recurring breaches and resulting damages that continued after exit from bankruptcy, mandates this dispute belonged in the state courts, only to be revisited by the bankruptcy court as to pre-Effective Date damages *if* the MSB Owners later elected to seek Section

503 treatment. *See*, *In re VistaCare Group, LLC*, 678 F.3d 218 (3d Cir. 2012) (affirming the bankruptcy court's decision to allow a creditor the right to proceed in state court under Section 959 on alleged post-bankruptcy breach claims, in circumstances where the request for leave was actually addressed, unlike the MSB Owners' Threshold Motion here); *In re WRT Energy Corp.*, 402 B.R. 717, 719-21, 727-28 (Bankr. W.D. La. 2007) (granting the movant leave to pursue state-law claims "in the forum of its choice" because the bankruptcy court lacked post-confirmation jurisdiction over the state-law claims).

At most, the bankruptcy court should have temporarily disallowed the Administrative Expense Reservation without prejudice for lack of ripeness, subject to reconsideration later in the event that the state court adjudicated the State-Law Claims in the MSB Owners' favor and then the MSB Owners determined they wanted to pursue administrative claim allowance and treatment for the portion of damages associated with the pre-Effective Date period only. *See* Fed. R. Bankr. P. 3008 ("A party in interest may move to reconsider an order allowing or disallowing a claim. After notice and a hearing, the court must issue an appropriate order.").

In addition, the district court incorrectly believed that no factual questions remain. ROA.15665. If the Leases terminated and thus title reverted, then further material factual issues are present and must be litigated before damages can be

awarded, including whether the trespass was in good or bad faith, the damages amount (which continues increasing daily), and which portion of damages arose before the Effective Date. Only then—and only if the MSB Owners elected to pursue collection of those pre-Effective Date damages as an administrative expense—would an analysis be required under Section 503 to assess whether those damages were actual and necessary costs of preserving the estate. Thus, all the remaining issues are not purely legal. The Administrative Expense Reservation is not ripe.

For all the reasons above, the Court should vacate the orders and opinions below in their entirety for lack of jurisdiction and order that the State-Law Claims may be adjudicated to finality in state court. That is the proper relief where jurisdiction is lacking. *See, e.g.*, *Cantu v Beck Redden*, No. 24-40275, 2024 WL 5199328, at *1 (5th Cir. Dec. 23, 2024) (vacating the judgment dismissing the plaintiff's state-law tort claim and ordering remand to state court for lack of federal jurisdiction); *Seven Seas Petroleum*, 522 F.3d at 580-83, 589-90 (vacating the orders dismissing the state-law tort claims and ordering remand to state court for lack of bankruptcy jurisdiction).

## II. The State-Law Claims are not "futile" because the MSB Leases terminated under their express terms.

Even if there were jurisdiction, this Court should reverse on the merits because the MSB Owners' State-Law Claims were not "futile." EPLP voluntarily

ceased production from the Leases because of its perceived economic advantage and then sought to save the leases by resorting to various theories not supported by the language of the applicable provisions of the Leases or Texas law. The lower courts erred in holding the Leases did not terminate.

A. **Texas law enforces oil and gas leases according to their terms, even when those terms diverge from those of typical leases.**

The lower courts misinterpreted the Leases in several ways. Most of the errors resulted from misapplication of a fundamental principle of Texas law: a lease must be interpreted by applying the plain meaning of the contractual terms. *BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 394 (Tex. 2017). The parties' Leases contain provisions far different than a "typical" lease, and Texas law requires that the MSB Owners receive the benefit of their bargain. The district court consistently erred in interpreting the parties' Leases in accordance with general rules developed in cases interpreting "typical" leases, rather than giving effect to the highly unique, non-typical terms the parties negotiated.

Each of the parties' Leases is a custom and complex lease agreement that is approximately 70 pages in length. ROA.12536-602. The Leases resulted from intense negotiations during a period of frantic lease competition in the Eagle Ford Shale boom. ROA.13160-62; *see also EP Energy*, 2022 WL 223253, at *6. The MSB Owners, controlling some of the most promising acreage in the Eagle Ford Shale play, secured

novel provisions deliberately crafted to avoid the permissive interpretations courts had applied to traditional lease forms. ROA.13160-62. Rather than accept standard industry provisions developed over decades to favor lessees, the MSB Owners insisted on and were given unique language specifically designed to impose stricter obligations regarding development and production. ROA.13160-62.

The parties' Leases differ significantly from traditional oil and gas lease forms, which had strongly favored lessees and spanned just 2-pages in length. *See* Christopher Kulander, *Down Step by Step - Ratification of Oil and Gas Leases by Royalty Interests in Texas*, 73 SMU L. Rev. 251, 290-91 (2020) (noting that traditional lease forms were lessee-friendly and spanned 2 pages, whereas modern markets have led to highly unique, complex, and lengthy lease forms that are significantly more lessor-friendly and contain novel language that leads to novel results); *see also* Laura Burney, *Implications for the Fate of Implied Covenants and Pro-Lessor Clauses in the Shale Era Oil and Gas Lease*, 48 St. Mary's L. J. 599, 606 and n.38 (2017) (stating "modern-day leases bear little resemblance" to traditional lease forms, as modern leases contain "extensive pro-lessor provisions" that lessors have "drafted in response to court decisions interpreting older forms" in order to reach lessor-friendly outcomes).

While several decades of Texas oil and gas law were developed by reference to traditional oil and gas lease provisions, Texans enjoy the freedom of contract, and the Texas Supreme Court has repeatedly made clear that leases are interpreted according to their actual terms. *See, e.g.*, *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020) ("The most important consideration in interpreting a lease is the agreement's plain, grammatical language."). A general rule *will not* compel an outcome in another case and will not even provide a default rule. *Wenske v. Ealy*, 521 S.W.3d 791, 797-98 (Tex. 2017). In *Devon Energy Production Co. L.P. v. Sheppard*, the Texas Supreme Court acknowledged that "commonly used terms" and "provisions that are standard throughout the . . . industry [that] have been judicially interpreted many times over many years" should be construed "in a uniform and predictable way." 668 S.W.3d 332, 346 (Tex. 2023). However, the *Devon* court made clear that common outcomes and general rules have no bearing on the interpretation of unique provisions that do not use standard, commonly used wording; instead, different lease language must be interpreted to "operate differently" than standard language. *See id.*

Because of that case-by-case approach to lease interpretation, novel terms produce novel results when correctly construed. The Texas Supreme Court reiterated that "[p]arties are free to draft novel contractual terms that produce

results some may consider odd; a court's duty is to give effect to the parties' intent as expressed in the contract's language." *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 220 (Tex. 2022). The Texas Supreme Court recognized that novel lease terms generally provide results that materially deviate from how leases "typically function." *Id.*

The Texas Supreme Court has recognized that modern lessors often avoid "typical" lessee-friendly lease forms that would allow the lessee to hold the entire lease by production from a small fraction of the leased acreage, and instead negotiate provisions that require full development or partial termination:

> Lessors, of course, typically desire that the operator fully develop the lease and produce as much as possible to maximize the lessors' royalties. . . . Thus, a 'habendum-only' lease—under which the lessee's production on only a small portion may permit the lessee to retain its rights as to the entire leased tract—may conflict with the lessor's desire to seek full development given the operator's ability to hold the entire estate by drilling only a single producing well.

*Endeavor Energy Res. L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 597 (Tex. 2018). MSB's Leases with EPLP reflect that desire for more rapid development.

But the lower courts' analyses disregarded the Leases' novel terms, and instead forced interpretations supported by more "typical" lease forms and insisted on the application of "general" outcomes reached by Texas courts analyzing traditional (and materially different) lease language. By adhering to "typical"

provisions and "general" outcomes, the lower courts deprived the MSB Owners of the benefit of their custom agreements, essentially destroying their freedom of contract.

The district court recognized that the parties' Leases contain unique terms, but it nevertheless used prior analyses of traditional lessee-friendly provisions to impose "typical" results in this case. ROA.15680 (conceding the cases relied upon by the lower courts "interpreted leases with differently worded . . . clauses," but stating those cases reflect a "typical" function in a standard lease). That was error.

**B.      The Subsequent Operations clause did not maintain the Leases.**

Plagued by the fundamental error described above, the lower courts erroneously held that the Subsequent Operations clause maintained the nine Leases where continuous development had concluded (being the A, B, and Maltsberger Leases).

The Subsequent Operations clause is a special limitation clause that controls how the production units may terminate following a cessation after the primary term. See *supra* pp.4-5. If production ceases from a production unit, the lease "shall

terminate . . . unless" the lessee timely commences "drilling" or "reworking

operations," as both are narrowly defined in the Leases[8]:

> If production should cease from any production unit, *this lease **shall terminate*** as to all lands and depths included within such unit *unless lessee commences drilling or reworking operations on such unit within one hundred twenty (120) consecutive days thereafter* and pursues such operations with diligence on the same or successive wells with no cessation of operations more than one hundred twenty (120) consecutive days; and if production is restored from such unit, this lease shall remain in effect as to the lands and depths included therein as long as oil or gas is produced from such unit, subject to the remaining provisions of this lease.

ROA.12570 (emphases added).

By invoking the Subsequent Operations clause, EPLP was required to fulfill

its requirement to timely conduct drilling or reworking operations, and its failure to

do so caused the termination of all Leases. As discussed in more detail below, the

phrase "shall terminate . . . unless" indicates this provision is a "special limitation"

that will actively cause the lease to terminate "unless" EPLP strictly complies with

the lease terms—in this case, timely commencing drilling or reworking operations

---

[8] The Leases narrowly defined the term "***drilling***" as "the actual drilling of a well shall be deemed to have commenced when a derrick, a rig and machinery capable of drilling to a depth sufficient to test a prospective or potential oil or gas horizon have been erected, and when such well has been spudded in and is rotating under power" and narrowly defined ***"reworking operations"*** as "actual work in the hole of a well, in a good and workmanlike manner, prosecuted with reasonable diligence, in an attempt to recomplete or repair said well to return it to production." ROA.12537-40.

and continuing those operations without delay. Only if those operations result in production will the leased premises contained in the production unit be maintained.

The lower courts erred in construing the provision as an optional "savings clause" and that the express requirement of commencing drilling or reworking operations can be ignored if EPLP resumes production by simply turning on the valve at the well.

### 1. The "shall terminate unless" language creates a special limitation, not a savings clause.

The district court's analysis rests on treating the Subsequent Operations Clause as if it were a typical savings clause rather than a special limitation. *See, e.g.*, ROA.15686-87. Texas courts have recognized the critical distinction between special limitations and savings clauses for decades. *See e.g.*, *Chandler v. Drummet*, 557 S.W.2d 313, 314 (Tex. Civ. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.) (holding that a lease clause using the phrase "shall not terminate if" provided an optional savings clause, while a special limitation could have been imposed with the phrase "shall terminate unless"); *PPC Acquisition Co. LLC v. Del. Basin Res., LLC*, 619 S.W.3d 338, 350 (Tex. App.—El Paso 2021, no pet.) (stating it is established that provisions stating a lease "shall terminate" unless conditions are satisfied "constitutes a special limitation"); *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d

497, 506 (Tex. App.—Waco 1997, writ denied) (clause stating "this lease shall terminate" creates a special limitation).

The Subsequent Operations is a special limitation because it says the "lease shall terminate . . . unless" drilling or reworking are timely commenced. A special limitation will automatically cut short the life of the lease upon the occurrence of the stipulated event, ***regardless of whether or not the habendum clause is satisfied***. *See, e.g.*, *Blackmon v. XTO Energy, Inc.*, 276 S.W.3d 600, 606 (Tex. App.—Waco 2008) (acknowledging that a lease could contain a special limitation terminating a lease for non-payment of royalties, even in the face of ongoing production under the habendum clause); *Thoreson v. Fox*, 390 S.W.2d 308, 311 (Tex. Civ. App.—Amarillo 1965) (a special limitation is "self-operative"), *rev'd on other grounds*, 398 S.W.2d 88 (Tex. 1966) (holding the lease did not contain a special limitation). This means that even if EPLP satisfied the habendum clause by eventually resuming production, that cannot save the lease from termination if EPLP failed to satisfy the special limitation's requirements. Compliance with special limitations must be "literal," and economic difficulties provide no excuse:

> Neither unavoidable delays or accidents, acts of God, unfavorable economic conditions, nor financial difficulties of the lessee will afford an excuse for the failure to comply literally with the provisions of this clause in the absence of an express stipulation otherwise contained in the lease.

*Duke v. Sun Oil Co.*, 320 F.2d 853, 858 (5th Cir. 1963), *decision clarified on reh'g*, 323 F.2d 518 (5th Cir. 1963).

The district court avoided these principles when it erroneously construed the provision as a savings clause. Though acknowledging the phrase "shall terminate" typically indicates a special limitation, the district court cited *Endeavor Energy v. Energen*, where similar language was held not to create a special limitation because the provision was legally ambiguous, but instead created a covenant. ROA.15683 (citing 615 S.W.3d at 155). The court in *Endeavor Energy v. Energen* did not construe the provision as an optional savings clause like the court did here. This reliance on *Endeavor Energy v. Energen* is completely misplaced because no party here has argued—nor any court found—that the clause is ambiguous.

The Leases do contain a Drilling or Reworking Operations clause crafted as a savings clause—providing that if production ceases, the Leases "shall not terminate if" timely action is taken. ROA.12562; *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 553-57 (Tex. 2002) (the phrase "shall not terminate if" indicates an optional savings clause). But this savings clause only applies to a cessation occurring during the primary term. ROA.12562.

After the primary term, the Subsequent Operations clause—containing the special limitation—controls what happens in the event of a cessation. ROA.12569-

70. The lower courts' conclusion depends on treating the Subsequent Operations clause as an optional savings clause EPLP could choose to utilize or ignore, but that reading finds no support in Texas law. Nor does it account for the parties' agreement to have one standard ("shall not terminate if") apply during the primary term under the Drilling or Reworking Operations clause, and a differently described standard ("shall terminate unless") apply after the primary term under the Subsequent Operations clause. *Compare* ROA.12562-63, *with* ROA.12569-70; *Sundown*, 622 S.W.3d at 888-89 (when parties use different language in different parts of a contract, courts must give those differences meaning).

Finally, the district court attempted to avoid the special limitation by suggesting that Texas courts "disfavor" such provisions. ROA.15683. While courts do "disfavor" finding a "forfeiture" under a "condition subsequent," that principle has no application to special limitations. *See Endeavor Energy v. Discovery Operating*, 554 S.W.3d at 606 n.14.

2.  **The Subsequent Operations clause required EPLP to timely commence drilling or reworking operations; merely resuming production was insufficient.**

Both lower courts held that EPLP satisfied the terms of the Subsequent Operations clause without conducting the required drilling or reworking operations within 120 days of a cessation. ROA.15684. The proper reading of the Subsequent

Operations clause is that the Leases "terminated unless" EPLP commenced drilling or reworking operations within 120 days as those terms are defined in the Leases.[9] Only if those operations restored production, would the Leases remain in effect. *See* ROA.12569-70. Contrary to the lower courts' holding, the phrase "and if production is restored in such unit" refers to production obtained through the required drilling or reworking operations—not production achieved through simply turning wells back on without any operations. Moreover, EPLP never "restored" production; it simply turned wells back on when it decided it was finished voluntarily shutting in the wells.

By holding that EPLP could maintain units by restarting production without drilling or reworking operations, the district court rewrites the Lease terms to impermissibly add a third alternative that the parties did not include. ROA.15684 (referring to resuming production as an "*additional* method" to maintain the Leases, obviating the requirement for drilling or reworking operations). This holding violates the principle that courts "may not rewrite the parties' contract nor add to its language." *Sundown Energy Ltd. P'ship v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 890 (Tex. 2021). The court held that EPLP could either (1) commence operations

---

[9] As stated above, the Leases contain custom, narrow definitions of both "drilling" and "reworking." *Supra* p.37 n.8.

within 120 days, or (2) simply turn production back on without any operations. *See* ROA.15684 ("The semicolon with the word 'and' is thus best taken to mean 'also,' with the following clause providing an ***additional*** method of maintaining the lease." (emphasis added)).

The lower courts' interpretation impermissibly transforms the conjunctive "and" into the disjunctive "or." The Texas Supreme Court has long held that "and" and "or" "are in no sense interchangeable terms, but, on the contrary, are used in the structure of language for purposes entirely variant, the former being strictly of a conjunctive, the latter, of a disjunctive, nature." *Bd. of Ins. Com'rs of Tex. v. Guardian Life Ins. Co. of Tex.*, 180 S.W.2d 906, 908 (Tex. 1944). The distinction is material because "[t]he participle 'and' is conjunctive" and "expresses the general relation of connection or addition, especially combination . . . and signifies something to follow, expressing the idea that what follows is added and taken along with the first." *Cmty. Bank of Raymore v. Chesapeake Expl., L.L.C.*, 416 S.W.3d 750, 757 (Tex. App.—El Paso 2013, no pet.) (citing *Int'l Sec. Life Ins. Co. v. Arant*, 463 S.W.2d 523, 525-26 (Tex. Civ. App.—Amarillo 1971, writ ref'd n.r.e.)).

### 3. The Subsequent Operations provision does not allow voluntary cessation without required operations.

The district court's interpretation would allow EPLP to voluntarily cease production for purely economic reasons and then maintain the lease by simply

restarting production without conducting any operations. This reading cannot be squared with either the special limitation's express requirements or EPLP's own conduct when it first ceased production.

The provision's structure—requiring specific operations to avoid termination—reflects the parties' intent that EPLP would maintain production unless mechanical or technical issues required drilling or reworking to restore it. ROA.12569-70. EPLP's interpretation would transform a clause designed to address necessary technical interruptions into a generalized right to voluntarily cease production for purely economic reasons. Nothing in the Leases' text supports such a reading, and it cannot be squared with the custom provisions that EPLP agreed upon to maintain aggressive development and production. Moreover, the lower courts' interpretation renders meaningless the parties' decision to use language indicating an optional savings clause for a cessation during the primary term and language indicating a special limitation in the clause pertaining to a cessation after the primary term. *Compare* ROA.12562-63 (applicable during the primary term), *with* ROA.12569-70 (applicable after the primary term ends).

Both lower courts expressed concern that requiring compliance with the special limitation's express terms could lead to an "odd (or perhaps unreasonable result)." ROA.15682-83 (citing ROA.5694-95). The courts worried that EPLP

"would be forced to expend additional resources [drilling or reworking]" when it could simply restart production. ROA.15682-83. But that is what EPLP agreed to in these Leases. "The fact that additional drilling was economically impracticable is no excuse" for failing to comply with a cessation provision's requirements. *See Haby v. Stanolind Oil & Gas Co.*, 228 F.2d 298, 306 (5th Cir. 1955). "Parties are free to draft novel contractual terms that produce results some may consider odd; a court's duty is to give effect to the parties' intent as expressed in the contract's language." *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 220 (Tex. 2022). Moreover, the Texas Supreme Court has expressly acknowledged that parties may agree to impose a special limitation to terminate a lease in the face of a cessation of production or a failure to timely commence additional drilling. *Endeavor Energy v. Discovery Operating*, 554 S.W.3d at 606 (Tex. 2018); *Tier 1 Res. Partners v. Del. Basin Res. LLC*, 633 S.W.3d 730, 738-39 (Tex. App.—El Paso 2021, pet. dism'd).

The district court's appeal to the Temporary Cessation of Production Doctrine to justify EPLP's failure to conduct required operations is misplaced. ROA.15691-92. Texas law is crystal clear that the doctrine has no application where, as here, a lease contains an express cessation of production clause. The Texas Supreme Court addressed this issue in *Samano v. Sun Oil Co.*, holding that "the terms of the lease prevent the application of the temporary cessation doctrine"

where a lease includes an express drilling and reworking clause. 621 S.W.2d 580, 584 (Tex. 1981). Leading commentators agree this is black-letter law: "where the parties have negotiated a specific cessation of production clause the terms of the clause will preempt the application of the [Temporary Cessation of Production] doctrine." Bruce Kramer, *The Temporary Cessation Doctrine: A Practical Response to an Ideological Dilemma*, 43 Baylor L. Rev. 519, 520 (1991).

The parties carefully crafted their 70-page custom lease, and the MSB Owners are entitled to the benefit of the bargain. EPLP agreed and benefited from the Leases, and the lower court erred in releasing EPLP from burdens it had agreed to follow that are imposed by the Leases based on concerns of perceived "odd (and perhaps unreasonable) results." ROA.15682. Notably here in contrast, any alleged inequity is created by EPLP's trying to drive a round peg into a square hole and its own conduct. EPLP made the decision (mistakenly perhaps, but a business decision) to declare an event of *force majeure* and voluntarily cease production, and the MSB Owners quickly objected to the improper invocation of the *force majeure* clause. ROA.940, 942-43. When EPLP later abandoned this argument and invoked the Subsequent Operations clause, a clause uniquely tailored to pertain to a cessation that would be remedied by drilling or reworking operations, it took on the obligation to show strict compliance. The parties carefully bargained for these terms, and the

potential for termination of the Leases was made plain in several places. EPLP's

disregard of the terms operates against continuation of Leases.

### 4. The district court misinterpreted the "deemed permanent" language in the Leases.

The district court compounded its error by misinterpreting the final sentence

Subsequent Operations clause, which states:

> Any cessation or absence of drilling or reworking operations or production on or from a production unit which continues for a period of one hundred twenty (120) consecutive days or more shall be ***deemed*** for all purposes of this lease to be permanent and not temporary[.]

ROA.12570-71 (emphasis added).

The court overlooked the fact that a "deemed permanent cessation" is not

required to trigger the Subsequent Operations clause. ROA.12569-71. The clause is

triggered by ***any*** cessation, and nothing in Paragraph XI(d) changes that.

ROA.12570. The Subsequent Operations clause does not merely call for termination

of the Leases as to production units only when there is a "deemed permanent

cessation" followed by EPLP failing to ***continue*** operations for 120 days. Instead, the

clause makes clear that the Leases terminate after any cessation (not just after a

"deemed permanent cessation") unless EPLP timely ***commences*** "drilling" or

"reworking operations." ROA.12569-70.

The district court lost sight of this basic point when it stated that the provision "clarifies" the unambiguous portion of the Subsequent Operations clause at issue. ROA.15685. The district court's use of this provision to rewrite the Subsequent Operations was error.

The "deemed . . . permanent" language does not define when a cessation becomes permanent—it merely provides that cessations lasting 120 days will be *treated as if* they were permanent absent a "workover" occurring, as that term is narrowly defined. ROA.12570-71. To "deem" means "[t]o treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have." *Deem*, Black's Law Dictionary (12th ed. 2024). Nothing in this language requires a cessation to be "deemed permanent" before it qualifies as a "cessation" under the second sentence of the Subsequent Operations clause (nor does that sentence use the triggering words "deemed permanent cessation" or "permanent cessation"). ROA.12569-71.

The provision operates as a catch-all to ensure that lengthy cessations will be treated as permanent even if they might otherwise qualify as temporary—it does not create a safe harbor allowing EPLP to maintain the lease through shorter voluntary cessations barring drilling or workover operations, which is undisputed to never have been done.

More fundamentally, the district court's interpretation renders the special limitation in the second sentence of the Subsequent Operations clause meaningless. That provision creates an automatic termination that is triggered by any "cessation"—not just a "deemed permanent cessation"—unless drilling or reworking operations are timely commenced. ROA.12569-70. The "deemed . . . permanent" provision appears after this special limitation and cannot override its express requirements. ROA.12570-71. Under Texas law, "the specific controls over the general." *Grynberg v. Grey Wolf Drilling Co. LP*, 296 S.W.3d 132, 137 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The specific special limitation that references any "cessation" controls over the later general provision defining a "deemed . . . permanent" cessation.

The district court's interpretation would allow EPLP to voluntarily cease production and then momentarily turn wells back on every 119 days with impunity—an absurd result that cannot be squared with the Leases' express terms. The proper reading is that the "deemed . . . permanent" language reinforces rather than negates the special limitation by ensuring that lengthy cessations will be treated as permanent even if they might otherwise qualify as temporary under other provisions. The language broadens the scope of what will be considered permanent; it does not create a safe harbor allowing EPLP to ignore the special limitation's requirements.

**C.      The Continuous Development clause did not maintain the Leases.**

Nor did the Continuous Development clause maintain the Leases and prevent them from terminating under the Subsequent Operations clause. For seven of the Leases, the lower courts held that continuous development maintained each lease "in its entirety" regardless of any cessation in already-developed and designated production units so long as EPLP was conducting continuous development operations and EPLP did not need to satisfy the Subsequent Operations clause. ROA.15680-81.

**1.      The Continuous Development clause expressly indicates it is subordinate to other provisions that may cause earlier termination, including the Subsequent Operations clause.**

The Continuous Development clause begins with critical limiting language that the district court simply cast aside: "Likewise, *if this lease has not otherwise terminated as herein elsewhere provided* . . . ." ROA.12566 (emphasis added). This prefatory language does far more than merely acknowledge the possibility of termination under other provisions—it explicitly subordinates the entire Continuous Development clause to other termination provisions in the Lease. By using this structure, the parties made clear that continuous development rights exist only to the extent they have not been cut off by other termination events.

By treating continuous development as an override that maintains the entirety of the Leases notwithstanding other provisions, the district court elevated the Continuous Development clause above other provisions despite express language making it subordinate to them. This not only ignores the parties' chosen language but inverts their carefully crafted hierarchy of lease maintenance provisions.

The district court erroneously concluded that the Continuous Development clause could serve as a panacea because it presumed that, once the Subsequent Operations clause became effective, that provision immediately required some termination of a portion of the Lease or precluded further continuous development. ROA.15680. The Leases do not require either result. The first sentence of the Subsequent Operations clause itself does not call for termination, but merely narrows the scope of operations and production that will hold each production unit. *See supra* pp.4-5. The first sentence of the Subsequent Operations clause says nothing about acreage outside of production units. *See* ROA.12569-70. As a result, after the primary term, EPLP had the right to continue (1) drilling new continuous development wells on lands outside existing production units, (2) establishing new production units as new wells were drilled, and (3) operating under this method "until [EPLP] has completed a sufficient number of wells to continue this lease in force as to all the leased premises as provided in *Paragraph* IX." ROA.12565-66.

### 2. Different triggering language must be given different meanings.

Both lower courts erroneously concluded that the Subsequent Operations clause does not apply to the Leases where EPLP was conducting continuous operations based on an interpretation that the Subsequent Operations clause is not effective until the later of the end of the primary term or continuous development. ROA.15677-78. Because the primary term has ended—making the Subsequent Operations clause effective—EPLP's alleged continuous development on acreage outside existing production units does not maintain the production units. As stated in the first sentence of the Subsequent Operations clause, each of those units can only be maintained by operations or production within each respective unit.

The Subsequent Operations clause becomes effective "[a]fter the occurrence of *any* event in" the Termination clause. ROA.12569-70 (emphasis added). In turn, the Termination clause describes two events: (i) expiration of the primary term and (ii) the end of continuous development. ROA.12568. Unlike the Subsequent Operations clause, the Termination clause is not triggered by the occurrence of "any" of those two events, but it is instead triggered by "the later of" of the two. ROA.12568. Accordingly, the two different provisions can become effective at different times. But the lower courts held that both clauses become effective only

upon the later of the two events, despite the clauses each using materially different language.

The parties' choice of "any event" in one clause, and "the later of" in another clause, is significant and must be given independent meaning. ROA.12568-70. "Using different language in different parts of a contract means the parties intended different things." *Sundown*, 622 S.W.3d at 888-89. Courts "cannot apply an interpretation . . . that would render these distinctions meaningless." *Id.*; *see also PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 708 (Tex. App.—Dallas 2011, pet. denied) ("The use of different language in different parts of a contract generally means that the parties intended different things.").

If the parties had intended the Subsequent Operations Clause to be triggered only after both events occurred, they would have used the same "the later of" language they employed in the Termination provision. Instead, they chose the broader trigger of "any event"—language that plainly encompasses the occurrence of either the end of the primary term or the cessation of continuous development. ROA.12569-70.

It is undisputed that the primary term ended in 2013. ROA.15675. Under the plain language of the Subsequent Operations Clause, this event—standing alone— was sufficient to trigger the clause's requirements for maintaining production units.

The district court erred by refusing to give effect to this clear language and instead rewriting it to match the different triggering mechanism used in the Termination provision.

### 3. The Continuous Development clause is designed to work with both the Production Units clause and Subsequent Operations clause to promote continuous and complete development of the entire leased premises.

The first sentence in the Subsequent Operations clause—defining when the clause becomes effective—is a material component to the Leases' overall structure designed to promote efficient and complete development. As discussed above, the Subsequent Operations clause requires that each production unit may only be maintained by production within that unit. *Supra* pp.4-5.

Production units must be designated within "within Sixty (60) days after the expiration of the primary term." ROA.12566-68. This precise timing requirement serves two critical functions that the district court overlooked. First, it creates an immediate segregation between developed and undeveloped acreage at the primary term's end. By requiring unit designation while continuous development may still be ongoing, the Leases establish that production units and undeveloped acreage can—and must—coexist until the Leases are fully developed. Second, this timing demonstrates that the Subsequent Operations clause's requirements were meant to apply during—not just after—continuous development. The designation of

production units at the primary term's end would serve no purpose if those units were not immediately subject to the clause's maintenance requirements.

The district court erroneously presumed that if the Subsequent Operations clause takes effect at the primary term's end, that would prevent EPLP from continuing development under the Continuous Development clause. ROA.15679. This interpretation misunderstands how these provisions work together. The Subsequent Operations clause only addresses maintenance of lands *within* production units (i.e., lands already developed). The undeveloped portion of the leased premises is not contained in a production unit, and therefore drilling on undeveloped lands would not be affected by the Subsequent Operations clause.

The district court relied heavily on *Mayo* and *Raymore*, stating that "similar" clauses in other leases "typically do not take effect until after the continuous drilling or other savings provisions reach their end." ROA.15680 (citing *Community Bank of Raymore v. Chesapeake Exploration, LLC*, 416 S.W.3d 750, 756 (Tex. App.—El Paso 2013, no pet.) and *Mayo Found. for Med. Educ. & Research v. Courson Oil & Gas, Inc.* 505 S.W.3d 68, 70, 72-73 (Tex. App.—Amarillo 2016, pet. denied)). But neither case involved lease language remotely similar to the MSB Leases, and both courts' holdings turned entirely on materially different express language.

*Raymore* involved a lease containing a unique provision that expressly extended the ***primary term*** if the lessee was engaged in continuous development operations. 416 S.W.3d at 757 ("Accordingly, the plain language of the severance clause [making production units separate leases] provides that the lease's primary term is extended by continuous development and that severance will not occur until after the expiration of the extended primary term."). It is undisputed that the parties' Leases' primary term ended a decade ago and is not extended by continuous development. ROA.15675. The entire rationale of *Raymore* is therefore inapplicable.

*Mayo* is also distinguishable because the lease there prohibited the simultaneous existence of production units and undeveloped land. The court explained that "under this provision, production units and 'undeveloped' land cannot exist simultaneously because all lands covered by the lease but not included in production units must be released when the production units are designated." *Mayo*, 505 S.W.3d at 72. This was critical because production units were not even formed until ***after*** continuous development ended. *See id.* The *Mayo* court's holding turned on this timing—the separate lease clause in that case could not take effect until units were established, and individual units could not be established under that lease until the conclusion of any continuous development. *See id.* at 72-73. The MSB

Leases mandate the opposite approach, requiring unit designation after the primary term regardless of ongoing continuous development.

The lower courts never confronted these critical distinctions. Materially different language must lead to materially different results.

Far from futile, the State-Law Claims presented viable claims supported by the actual language of the Leases and such claims would likely produce a judgment for the MSB Owners for a substantial amount. For these reasons, the lower courts erred in holding that the Continuous Development clause maintained nine of the Leases.

## CONCLUSION

For these reasons, the MSB Owners respectfully request that the Court vacate the orders and opinions below in their entirety for lack of jurisdiction and order that the State-Law Claims may be adjudicated to finality in state court.

Alternatively, if there is jurisdiction to determine the merits of the State-Law Claims, then the MSB Owners request that the Court: (1) reverse the portions of the orders and opinions below that hold the Leases did not terminate, (2) determine the State-Law Claims are not "futile," (3) order that the Leases terminated, and (4) remand for determination of damages and other remedies as to the State-Law

Claims. The MSB Owners further request all other relief at equity or law to which they are entitled.

Dated: January 22, 2025

Respectfully submitted,

**HAYNES AND BOONE, LLP**

By: */s/ Patrick L. Hughes*
    Patrick L. Hughes
    patrick.hughes@haynesboone.com
    Natasha Breaux
    natasha.breaux@haynesboone.com
    Christina Fontenot Crozier
    christina.crozier@haynesboone.com
    David Trausch
    david.trausch@haynesboone.com
    1221 McKinney Street, Suite 4000
    Houston, Texas 77010
    Telephone: (713) 547-2000

**MCGINNIS LOCHRIDGE LLP**

    Christopher L. Halgren
    chalgren@mcginnislaw.com
    Austin W. Brister
    abrister@mcginnislaw.com
    609 Main Street, Suite 2800
    Houston, Texas 77002
    Telephone: (713) 615-8500

**MAYNARD NEXSEN PC**

Carlos R. Soltero
csoltero@maynardnexsen.com
2500 Bee Caves Road
Building 1, Suite 150
Austin, Texas 78746
Telephone: (737) 202-4873

Lee E. Bains, Jr.
lbains@maynardnexsen.com
1901 Sixth Avenue North
Suite 1700
Birmingham, AL  35203
Telephone: (205) 254-1022

**DAVIS GERALD & CREMER**

Shannon H. Ratliff
shratliff@dgclaw.com
515 Congress Ave., Suite 1510
Austin, Texas 78701-2984
Telephone: (512) 493-9600

**Attorneys for Appellants Storey
Minerals, Ltd., Storey Surface, Ltd.,
Maltsberger, LLC, Maltsberger/Storey
Ranch, LLC, Maltsberger/Storey Ranch
Lands, LLC, and Rene R. Barrientos, Ltd.**

# CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of January, 2025, I electronically transmitted the attached document to the Clerk of the Court of the 5th Circuit Court of Appeals using the ECF System of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Patrick L. Hughes*
Patrick L. Hughes

# ECF CERTIFICATION

I hereby certify that (i) the required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (ii) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; (iii) the document has been scanned for viruses using the most recent version of Symantec Endpoint Protection active scan and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues, per 5th Cir. R. 25.2.9.

*/s/ Patrick L. Hughes*
Patrick L. Hughes

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

■ this brief contains **12,575** words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

■ this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Equity font.

*/s/ Patrick L. Hughes*
Patrick L. Hughes